UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.

THE GENTERRA GROUP, LLC

 Plaintiff,

v.

SANITAS USA INC.,

 Defendant.
_____/

# COMPLAINT

The Genterra Group, LLC ("**Genterra**") through its undersigned attorneys files this Complaint against Sanitas USA Inc. ("**Sanitas**") and states as follows:

## I.  THE PARTIES

1. Plaintiff, Genterra, is an Arizona limited liability company with a principal place of business and headquarters in Flagstaff, Arizona.

2. Defendant, Sanitas, is a Florida corporation with its principal place of business and headquarters in Miami, Florida.

## II.  JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of different states with complete diversity. *See* 28 U.S.C.A. § 1332(a)(1) (West 2020).

4. This Court has personal jurisdiction over Defendant pursuant to 28 U.S.C. § 1332, because Defendant is located in this judicial district and has ongoing and systemic business in

this district. *See* 28 U.S.C.A. § 1332(c)(1) (West 2020). The contract at issue also requires that any action involving the contract be brought in a court of competent jurisdiction in Florida. *See* Agreement at ¶ 8.2.

5. Venue is proper in this judicial district under 28 U.S.C. § 1391 because the Defendant transacts business in this district, and the acts giving rise to the Complaint occurred in this district. *See* 28 U.S.C.A. § 1391(b)(1) (West 2020). Additionally, there is a forum selection clause in the contract between the parties designating this district as a proper venue. *See* Agreement at ¶ 8.2.

### III. FACTUAL BACKGROUND

6. Genterra is in the business of selecting, acquiring, entitling, designing, developing, building, owning, managing and leasing real property and related improvements.

7. Sanitas is in the business of operating medical facilities under the trade name "Clinisanitas."

8. Sanitas represented to Genterra that every facility it wanted to build in America would fall under the Clinisanitas trade name, totaling an estimated 250 to 300 Facilities.

**A.    THE MASTER DEVELOPMENT AGREEMENT**

9. On or about February 14, 2017, Genterra and Sanitas entered into a written *Master Development Agreement* (the "**Agreement**"), attached hereto as Exhibit 1.

10. The Agreement took effect on February 14, 2017 (the "**Effective Date**"), lasted for a period of eight (8) years (the "**Term**"), and was set to terminate on February 13, 2025 (the "**Termination Date**"), with automatic and successive one-year renewal terms. *See* Agreement at ¶¶ 4.1 & 4.2.

11. The stated purpose of the Agreement was to allow Sanitas "to engage Genterra on an [*sic*] preference basis to acquire and entitle real property, to design and build medical facilities thereon according to Sanitas' specifications, and thereafter to lease such property and improvements to Sanitas…" Agreement at ¶ B.

12. Pursuant to the Agreement, Sanitas was responsible for identifying geographical areas in the United States (the "**Catchment Areas**") within which it would seek to develop contractual arrangements with third party payors and managed care plans, and operate medical facilities that deliver health care services to patients (the "**Facilities**"). *See* Agreement at ¶ 1.1 (a).

13. Upon the identification of a Catchment Area, Sanitas was required to deliver written notice to Genterra which was required to include geographical boundaries, the number of Facilitates, timelines and completion dates, and proposed rental rates for every Facility that Sanitas wanted Genterra to build (the "**Catchment Notice**"). *See id*.

14. Within 30 days of the delivery of a Catchment Notice, Genterra was entitled to accept or decline to build and lease the Facilities discussed in the Catchment Notice. *See* Agreement at ¶ 1.1(b).

15. After a Catchment Notice was issued by Sanitas, and not declined by Genterra, Genterra was required to conduct an inspection of the Catchment Area to identify specific areas for Facilities, and prepare and submit to Sanitas a preliminary report and analysis (the "**Preliminary Reports**"). Agreement at ¶ 1.2(a).

16. Following the delivery of the Preliminary Report, the Agreement required Genterra to develop a definitive proposal for the acquisition, entitlement, design, building, and leasing of the completed project (the "**Definitive Proposal**"). Agreement at ¶ 1.3(a).

17. The obligations of both parties, including the identification of the Catchment Area, the design of each Facility, preparation of the Preliminary Report, the finalization of the Definitive Proposal, and the performance of acquisition, entitlement, design and building services in connection therewith shall be referred to as "**Development Services**."

## B. THE PROPRIETARY INFORMATION

18. Sanitas acknowledged and agreed that the Preliminary Reports and Definitive Proposals developed by Genterra "including any documentation, research, analysis, projections, proposed leases, definitive agreements and other information delivered in connection therewith" were the work product of Genterra. *See* Agreement at ¶ 5.4.

19. Additionally, the Agreement defined the Preliminary Reports and Definitive Proposals, as well as Genterra's "past, present, and potential future processes, procedures, policies, strategies, services, technology, specifications, programs, models, financial information and projections, data, know-how, developments, designs, improvements, software programs, products, marketing plans, patient records, physician and vendor lists, referral sources, referral arrangements, references and other business information and opportunities," as the Proprietary Information of Genterra (the "**Proprietary Information**"). Agreement at ¶ 5.1.

## C. THE RIGHT OF FIRST REFUSAL

20. Pursuant to the Agreement, when Sanitas identified an opportunity within the United States to operate a medical facility under the trade name "Clinisanitas" that required the Development Services (the "**Business Opportunity**"), Sanitas was required to first send a written offer for the Business Opportunity to Genterra. Upon receipt of the written offer, and for twenty (20) days thereafter (the "**Option Period**"), Genterra had the right of first refusal on any Business Opportunity (the "**Right of First Refusal**"). *See* Agreement at ¶ 2.

21. In exchange for the Right of First Refusal on each Business Opportunity during the Term of the Agreement, Genterra offered Sanitas, among other things, priority consideration and discounted bulk pricing for Development Services. Additionally, Genterra forwent other lucrative business opportunities so that Sanitas would be its main focus. Genterra sought not only financial profit from the Agreement, but also the opportunity to grow its business presence nationally. In order to achieve these outcomes, Genterra performed all of its obligations under the Agreement to the fullest extent possible and in a timely manner.

**D.     THE RESTRICTIVE COVENANTS**

22. Section 5 of the Agreement, titled "RESTRICTIVE COVENANTS," laid out Restrictive Covenants as between the parties lasting for the Term of the Agreement and one (1) year thereafter. *See* Agreement at ¶ 5.

23. These Restrictive Covenants included a "Confidentiality" clause, stating that "[e]ach Party, acting as a Receiving Party, agrees to keep strictly confidential all Proprietary Information received by it from a Disclosing Party and to use such Proprietary Information solely as necessary to carry out its duties and obligations under this Agreement or the other agreements between the Parties or their respective affiliates" (the "**Confidentiality Clause**"). Agreement at ¶ 5.1.

24. The Restrictive Covenants also included a "Non-Solicitation" clause, stating that "the Parties will not directly or through others, solicit, divert or take away from Genterra (or its affiliates) . . . the business or patronage of any clients, suppliers, contractors, subcontractors, vendors, referral sources or other business relationships of Genterra (or its affiliates) that were utilized in connection any [*sic*] of the [Development Services]" (the "**Non-Solicitation Clause**"). Agreement at ¶ 5.2.

5

25. Moreover, the Restrictive Covenants included a "No Hire" clause, stating that "neither Party or [*sic*] its affiliates will directly or through others (a) hire any individual who provided services to the other Party or its affiliates as an employee, consultant or independent contractor of the Party or its affiliates during the term of this Agreement" (the "**No Hire Clause**"). Agreement at ¶ 5.3.

26. Additionally, the Restrictive Covenants included a "Non-Circumvention" clause, stating that "Sanitas acknowledges and agree [*sic*] that any Preliminary Report or Definitive Proposal prepared and delivered to Sanitas . . . represent the work product of Genterra and are delivered in anticipation of the fact that the Parties will reach a definitive agreement on the terms for which Genterra (or its affiliates) will [perform the Development Services]. Under no circumstances will Sanitas circumvent (or attempt to circumvent) this Agreement by utilizing the information in order to engage another party to provide such [Development Services], or to provide such services internally on its own behalf" (the "**Non-Circumvention Clause**," and together with the Confidentiality Clause, the Non-Solicitation Clause, and the No Hire Clause, collectively the "**Restrictive Covenants**"). Agreement at ¶ 5.4.

27. The final subsection of the Restrictive Covenants section, the "Right to Injunction" clause, stated "[t]he Parties expressly agree that each shall be entitled to equitable relief in the event of, or to prevent, a breach of Section 5 of this Agreement. Resort to such equitable relief, however, shall not be construed as a waiver of any other rights or remedies that a Party may have for damages or otherwise. The various rights and remedies of the Parties under this Agreement or otherwise shall be construed to be cumulative, and no one of them shall be exclusive of any other or of any right or remedy allowed by law" (the "**Equitable Relief Clause**"). Agreement at ¶ 5.5.

### E. THE INITIAL PROJECTS

28. On or about May of 2017, Sanitas sent to Genterra a Business Opportunity pursuant to the terms of the Agreement. In total, Sanitas and Genterra worked together to build two Facilities between Summer 2017 and Fall 2019. Additionally, Genterra had begun preparing Proprietary Information for Sanitas in connection with a third Facility (collectively, the "**Initial Facilities**").

29. Relying upon the commitments made by Sanitas in the Agreement, Genterra formed (and was continuing to form) relationships with financers, architects, engineers, subcontractors, and other participants in the development and construction industry such that those parties would be available to Genterra on a priority basis to assist in development and construction of other Clinisanitas Facilities going forward during the Term of the Agreement (the "**Prospective Partners**").

### F. BREACH OF THE RIGHT OF FIRST REFUSAL

30. Subsequent to the Initial Facilities, Sanitas has not presented any new Business Opportunities to Genterra for Genterra's acceptance or rejection, as is required under the Agreement.

31. However, since the completion of the Initial Facilities, Sanitas has developed and constructed (or is in the process of developing or constructing) at least twelve (12) new operating medical Facilities in Texas, Florida, and elsewhere in the United States (the "**New Facilities**").

32. Although Genterra has consistently been ready, willing, and able to respond to any notice of a Business Opportunity from Sanitas, Sanitas has failed to provide Genterra with notice of the Business Opportunities to provide Development Services for the New Facilities, as is required under the Agreement.

73865920.1

33. Genterra has been damaged by each and every Business Opportunity provided to another builder or developer in violation of the Right of First Refusal.

### G. BREACH OF THE RESTRICTIVE COVENANTS

34. During development of the Initial Facilities, Genterra employed the services of Daniel Perez ("**Mr. Perez**") and his company, Perez McGee USA, as a subcontractor (together with Mr. Perez, collectively, the "**Subcontractor**").

35. True and accurate copies of the Subcontractor's invoices and wire transfers made by Genterra to the Subcontractor for services performed in connection with the Initial Facilities are attached hereto as Exhibit 2.

36. Upon information and belief, as the relationship between Genterra and Sanitas began to deteriorate, Sanitas continued to engage in communication with the Subcontractor, and propositioned the Subcontractor to provide Development Services to Sanitas directly.

37. Upon information and belief, Sanitas has since directly hired the Subcontractor to perform Development Services for the New Facilities, without Genterra's knowledge or consent.

38. Sanitas' hiring of the Subcontractor is evidenced on the Perez McGee USA website, where the Subcontractor lists Sanitas as a client.

39. A true and accurate copy of the "Client List" page of the Perez McGee USA website is attached hereto as Exhibit 3.

40. It also appears from the facts, upon information and belief, that Sanitas has utilized the Proprietary Information, including the proposals, reports, documentation, research, analysis, projections and/or other information, prepared by Genterra and provided to Sanitas in the course of the completed Initial Facilities for its own general benefit in engaging other developers, including the Subcontractor, for Development Services on the New Facilities.

41. On June 5, 2018, Sanitas sent an email to Genterra and the Subcontractor requesting "a call tomorrow related to Orlando expansion, construction, timing, etc."

42. A true and accurate copy of the June 5, 2018 email is attached hereto as <u>Exhibit 4</u>.

43. On June 26, 2018, Sanitas sent an email to Genterra and the Subcontractor stating "[b]ased on our conversation attached please find the drawings, please advise if you have these, or you already worked on these." Attached to the June 26 email were blueprints for three Facilities titled "South Orlando," "West Orlando," and "East Orlando." The Subcontractor responded to the June 26 email, stating "we will review these programs and do code analysis."

44. A true and accurate copy of the June 26, 2018 email is attached hereto as <u>Exhibit 5</u>.

45. On July 3, 2018, Sanitas sent Genterra and the Subcontractor another blueprint titled "Central Orlando" (Central Orlando, South Orlando, West Orlando, and East Orlando are, collectively, the "**Florida Facilities**"). Sanitas also included street addresses for all four Florida Facilities, and requested that Genterra and the Subcontractor "[p]lease provide us an update of where we are based on our conversation this afternoon."

46. A true and accurate copy of the July 3, 2018 email is attached hereto as <u>Exhibit 6</u>.

47. On July 10, 2018, Genterra sent an email to Sanitas stating "[w]e are moving forward with design and permits for . . . Florida Projects as directed and discussed in our meeting today."

48. A true and accurate copy of the July 10, 2018 email is attached hereto as <u>Exhibit 7</u>.

49. Upon information and belief, Genterra developed Proprietary Information for the Florida Facilities, and delivered the same to Sanitas in anticipation of providing Development Services for the Florida Facilities pursuant to the Agreement.

50. However, on August 13, 2018, Sanitas sent an email to Genterra pressuring Genterra to immediately begin Development Services for the Florida Facilities, because Sanitas had promised the Guide Well Sanitas I board of managers it would meet a completion deadline of October 31, 2019.

51. The same day, Genterra sent an email to Sanitas stating "[i]n order to start new projects we will have to follow the protocol that is in our agreement. . . My team has been working on a flow chart and process plan that follows each step of our development agreement. I will share that with you shortly. . . All in all if we started on this tomorrow the best case scenario will be the end of December." Genterra then sent Proprietary Information for the Florida Facilities to Sanitas in good faith.

52. On August 14, 2018, Sanitas responded by telling Genterra it would "proceed with the Orlando project separately from this project."

53. A true and accurate copy of the August 13-14, 2018 email exchange is attached hereto as Exhibit 8.

54. Upon information and belief, rather than comply with the procedures the Parties had agreed to, Sanitas opted to offer the Business Opportunities for the Florida Facilities to other developers, including the Subcontractor.

55. According to its website, Sanitas is currently operating four New Facilities with the same street addresses as those provided for the Florida Facilities in the July 3, 2018 email.

56. A true and accurate copy of the "Locations" page of the Sanitas website is attached hereto as Exhibit 9.

57. Evidently, Sanitas employed third parties to develop and construct the Florida Facilities without Genterra's knowledge or consent, and utilized the Proprietary Information that Genterra had produced and provided for the Florida Facilities to complete the development and construction of those New Facilities.

58. Additionally, according to the Subcontractor's website, the Subcontractor constructed at least one New Facility for Sanitas in Orlando, Florida in 2018.

**H.    DISCOVERY OF THE BREACHES**

59. Upon Genterra's discovery that Sanitas was offering Business Opportunities to other developers, including the Subcontractor, in violation of the Right of First Refusal and the Restrictive Covenants, Genterra sent Sanitas a demand letter dated January 6, 2020 requesting an explanation and demanding Sanitas cease development of any New Facility which was not first offered to and denied by Genterra (the "**Demand Letter**").

60. A true and accurate copy of the Demand Letter is attached hereto as Exhibit 10.

**I.    CONTRACTUAL REMEDIES FOR BREACH UNDER THE AGREEMENT**

61. The Agreement was never terminated by either party pursuant to the early termination procedures of the Agreement. *See* Agreement at ¶ 4.3.

62. To the extent that Sanitas contends the Agreement was abandoned or terminated, Sanitas never delivered Genterra notice of or opportunity to cure any alleged breach of the Agreement on the part of Genterra that would give rise to a right of early termination. *See id*. at ¶ 4.3(a).

63. Furthermore, the Agreement provided that upon termination or expiration of the Agreement for any reason, neither party would be released from any obligation due to the other party that accrued during the Term. *See id*. at ¶ 4.4. On the contrary, the Agreement expressly provided that certain sections, including the Restrictive Covenants section, survived termination or expiration of the Agreement. *See id*. at ¶ 4.5.

64. The Agreement also provided that "[i]n the event of litigation between the Parties in connection with this Agreement, the prevailing Party shall be entitled to recover its reasonable attorneys' fees and costs from the non-prevailing Party." *Id.* at ¶ 8.12.

### IV.  COUNT I – BREACH OF CONTRACT

65. Genterra restates the allegations set forth in paragraphs 1-64 as if fully restated herein.

66. The Agreement constitutes a valid and enforceable contract between Genterra and Sanitas.

67. Genterra has complied with all material obligations of the Agreement and fully performed all obligations under the Agreement, to the extent Genterra's efforts to perform its obligations were not obstructed by Sanitas.

68. Sanitas willfully and intentionally breached the Agreement when it offered Business Opportunities to provide Development Services for the Florida Facilities, and other New Facilities to third parties, including the Subcontractor, in violation of Genterra's Right of First Refusal and the Restrictive Covenants set forth in the Agreement.

69. Sanitas also willfully and intentionally breached the Agreement when it disclosed the Proprietary Information of Genterra to third parties, including the Subcontractor, to be

utilized in the Development Services for the Florida Facilities, and other New Facilities in violation of the Confidentiality Clause in the Restrictive Covenants set forth in the Agreement.

70. Sanitas' actions caused Genterra to lose lucrative multi-million dollar opportunities to develop new Business Opportunities promised to it under the Agreement.

71. As a result of Sanitas' willful and intentional breach of the Contract, Genterra has suffered substantial damages in an amount to be determined at trial that exceeds $75,000.

## V. COUNT II – INJUNCTION

72. Genterra restates the allegations set forth in paragraphs 1-19, 22-27, 29, 34-58, and 63 as if fully restated herein.

73. As further explained in the *Motion for Preliminary Injunction and Memorandum of Law in Support Thereof*, filed concurrently with this Complaint (the "**Motion**"), Genterra is entitled to equitable relief in the form of an injunction.

74. Genterra has a substantial likelihood of success on the merits of this Complaint.

75. The various breaches by Sanitas have caused, and continue to cause, irreparable injury to the goodwill and reputation of Genterra with the Prospective Partners and the development and construction industry as a whole.

76. Sanitas has violated the Restrictive Covenants section of the Agreement by (i) soliciting, hiring, and taking away from Genterra the Subcontractor, who provided services for development and construction of the Initial Facilities to Genterra; and (ii) disclosing and utilizing Proprietary Information developed by Genterra in order to engage the Subcontractor to provide Development Services for the Florida Facilities, and other New Facilities. In Florida, "[t]he violation of an enforceable restrictive covenant creates a presumption of irreparable injury to the

13

73865920.1

person seeking enforcement of a restrictive covenant." *Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, 1231 (11th Cir. 2009) (quoting Fla. Stat. Ann. § 542.335(1)(j) (West 2019)).

77. The threatened harm to Genterra of Sanitas' continuing breach of the Agreement outweighs any potential harm to Sanitas or any innocent third parties if the injunction is granted.

78. Granting an injunction would not disserve the public interest because the public has "the public has a cognizable interest in the protection and enforcement of contractual rights." *Hilb Rogal & Hobbs of Fla., Inc. v. Grimmel*, 48 So.3d 957, 962 (Fla. Dist. Ct. App. 2010)

79. Additionally, the Equitable Remedies Clause expressly provides for injunctive relief to Genterra under these circumstances. *See* Agreement at ¶ 5.5.

80. Unless Sanitas is enjoined from developing or building any additional New Facilities, and any current construction on New Facilities is halted, the number of Facilities left for Genterra to develop and construct under the Agreement will evaporate, and any ability of Genterra to realize the promise of the Agreement will be destroyed.

81. Genterra has no plain, speedy, or adequate remedy at law to obtain redress for the grievances herein complained. Unless Sanitas is restrained and enjoined from hiring other developers to build facilities, Genterra will be irreparably harmed.

## VI.  COUNT III - BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

82. Genterra restates the allegations set forth in paragraphs 1-17, 20-21, 28-29, 30-32, 36-37, 40, and 50-58 as if fully restated herein.

83. "Under Florida law, the implied covenant of good faith and fair dealing is a part of every contract." *Burger King Corp. v. Weaver*, 169 F.3d 1310, 1315 (11th Cir. 1999) (citing *County of Brevard v. Miorelli Eng'g, Inc.*, 703 So.2d 1049, 1050 (Fla. 1997)).

84. "Good faith means honesty, in fact, in the conduct of contractual relations." *Id*. (quoting *Harrison Land Dev., Inc. v. R & H Holding, Co., Inc.*, 518 So.2d 353, 355 (Fla. Dist. Ct. App. 1988)).

85. Sanitas breached its duty of good faith and fair dealing to Genterra by providing false or materially incomplete information to Plaintiff under the Agreement and otherwise, and by concealing material information from Genterra.

86. As a result, Genterra suffered substantial damages in an amount to be proven at trial that exceeds $75,000.

## VII. COUNT IV– FRAUDULENT INDUCEMENT

87. Genterra restates the allegations set forth in paragraphs 1-23, 26, 28-33, and 40-57 as if fully restated herein.

88. Under Florida law, the elements of fraudulent inducement are "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation." *Moriber v. Dreiling*, 194 So.3d 369, 373 (Fla. Dist. Ct. App. 2016) (citing *Butler v. Yusem*, 44 So.3d 102, 105 (Fla. 2010); and *GEICO Gen. Ins. Co. v. Hoy*, 136 So.3d 647, 651 (Fla. Dist. Ct. App. 2013)).

89. Sanitas falsely told Genterra that during the Term of the Agreement Sanitas would not engage a third party to provide Development Services for any Facilities without first presenting the Business Opportunity to Genterra.

90. Sanitas knew at the time of the representation that it would not honor its commitment in the Agreement to offer Business Opportunities to Genterra first.

91. Sanitas made this representation to Genterra to induce Genterra to sign the Agreement to get preferential pricing for the Initial Facilities without ever intending to offer Genterra additional Business Opportunities.

92. The price quoted for the Initial Facilities would have been substantially higher without the promise of numerous additional Business Opportunities as described in the Agreement.

93. Genterra reasonably relied on Sanitas' misrepresentations and signed the Agreement that provided reduced rates for the Initial Facilities.

94. Additionally, Sanitas knew at the time it requested Proprietary Information from Genterra for the Florida Facilities that it would not offer the Business Opportunity to provide Development Services for the Florida Facilities to Genterra.

95. As a direct result of Genterra's reasonable reliance on Sanitas' misrepresentations, Genterra suffered substantial damages in an amount to be proven at trial that exceeds $75,000.

## IV. COUNT V – TORTIOUS INTERFERENCE WITH A CONTRACT OR BUSINESS RELATIONSHIP

96. Genterra restates the allegations set forth in paragraphs 1-11, 22, 24-27, and 34-58 as if fully restated herein.

97. Under Florida law, "[f]our elements are required to establish tortious interference with a contractual or business relationship: (1) the existence of a business relationship or contract; (2) knowledge of the business relationship or contract on the part of the defendant; (3) an intentional and unjustified interference with the business relationship or procurement of the contract's breach; and (4) damage to the plaintiff as a result of the interference." *Howard v. Murray*, 184 So.3d 1155, 1166 (Fla. Dist. Ct. App. 2015) (citing *Tamiami Trail Tours, Inc. v.*

16

*Cotton*, 463 So.2d 1126, 1127 (Fla. 1985); and *McKinney—Green, Inc. v. Davis*, 606 So.2d 393, 397-98 (Fla. Dist. Ct. App. 1992)).

98. Genterra had an established and on-going business relationship with the Subcontractor before the Parties entered into the Agreement, and throughout development and construction of the Initial Facilities.

99. Sanitas knew of the existence of the business relationship between Genterra and the Subcontractor through Sanitas' extensive conversations and working interactions with Genterra and the Subcontractor during the development of the Initial Facilities.

100. Sanitas intentionally and unjustifiably interfered with the business relationship between Genterra and the Subcontractor by soliciting, taking away and hiring the Subcontractor to work for Sanitas directly, rather than perform work for the benefit of Sanitas as a subcontractor of Genterra.

101. Sanitas' interference in the business relationship has caused Genterra to lose its Subcontractor and forced Genterra out of the development and construction process for the New Facilities all together, thereby causing Genterra substantial damage in an amount to be proven at trial exceeding $75,000.

WHEREFORE, Plaintiff Genterra respectfully requests the Court:

a. Enter judgment in favor of Genterra and against the Defendant Sanitas for damages in an amount to be proven at trial, and for interest upon such amount at the highest rate allowable by law;

b. Grant a preliminary injunction to halt the all Development Services currently in progress for New Facilities throughout the United States;

c. Grant a preliminary injunction to enjoin Sanitas from offering new Business Opportunities to the Subcontractor and any other third parties;

    d. Award Genterra its reasonable attorneys' fees and its costs herein expended pursuant to section 8.12 of the Agreement; and

    e. Order such other and further relief as the Court deems just and proper under the circumstances.

Dated: June 10, 2020                                                      Respectfully submitted,

                                                                                        */s/ Brendan I. Herbert*
Brendan Herbert, Esquire
Florida Bar No. 076925
POLSINELLI PC
1111 Brickell Avenue, Suite 2800
Miami, Florida 33131
Phone: (305) 921-1820
Fax:    (305) 921-1801
bherbert@polsinelli.com

18